853 So.2d 181 (2002)
David BROWN
v.
The POOL DEPOT, INC.
1011032.
Supreme Court of Alabama.
December 20, 2002.
Stan Brobston of Brobston & Brobston, P.C., Bessemer, for appellant.
James A. Kee, Jr., Angela C. Shields, and Olivia S. Matuszak of Kee & Selby, L.L.P., Birmingham, for appellee.
JOHNSTONE, Justice.
The plaintiff David Brown appeals the order of the trial court compelling him to arbitrate his tort claims against the defendant The Pool Depot, Inc. Brown argues that, because Pool Depot, a foreign corporation, was not qualified to do business in Alabama at the time Pool Depot contracted to sell and to install an aboveground pool at Brown's Alabama residence, Alabama's door-closing statute, § 10-2B-15.02, Ala.Code 1975, voids the pool contract and bars Pool Depot from enforcing *182 the pool contract and its arbitration provision. We agree.
On February 29, 2000, a representative of Pool Depot, a Georgia corporation, approached Brown, an Alabama resident, to solicit Brown's purchase of an aboveground pool to be installed by Pool Depot at Brown's Alabama residence. On that day Brown executed a contract for the purchase and installation of the aboveground pool. The contract reads in part:
 "The Pool Depot
 Incorporated
 Of Georgia
 "Date: 2-29-00
 "Over 20,000
 Pools Installed
"Florida License, Tennessee License, Virginia License, Maryland License
"120 Interstate North Parkway East * Suite 426 * Atlanta, Georgia 30339
(Local) XXX-XXX-XXXX * (Out of Area) 800-788-9832 * www.pooldepot.net
"Purchasers affidavit: I (We) Attest that I (We) have Legal Ownership of the listed real
property below:
"Name: David Brown
"Address: 1713 Neil Road County: Jefferson
"City: Birmingham State: AL Zip: 35214
"Phone______
"Section A) Pool Package includes: Purchase Price $9495.00
"1-1/2H.P. Pump, 150 lbs. capacity
"sand filter system, automatic timer,
"underwater light, automatic pool sweep, Deposit Received $ 200.00
"25 GA sparkle print virgin vinyl liner
"with tile border, automatic pool Balance Due $9295.00
"purification system, in-wall skimmer
"chemical start-up kit, wall mounted fountain,
"solar blanket winter cover
"Section B) Pool Size & Type
"[x]24'Round [ ]27'Round [ ]Oval
"[ ]A-frame ladder (to be used without a deck)
"[x]In-pool ladder (to be used only with a deck)
"Section C)....
"Section D)....
"Section E) Completely Installed: A leveling of plain dirt is included in the contract price.
Any dig over 2 feet purchaser agrees to pay $8 per inch directly to the installation crew at
the time of installation. The 2-foot dig does not include digging down into level ground to
bury the pool, hauling in dirt, or any type of rock removal. These require additional
charges and should purchaser [Brown] require dealer [Pool Depot] to perform such
services, purchaser agrees to pay these additional charges to the dealer. Installation
normally takes one or more days. Installation crew will supply approximately 2 tons of
sand and concrete blocks (if deemed necessary by the installation crew). Installers use
various types of equipment depending on the difficulty of installation.
*183
"Section F) Completion: Dealer [Pool Depot] and Purchaser [Brown] agree that the pool is
completed when the pool is assembled. Dealer will not be expected to wait until
purchaser's pool is filled with water to receive payment. (It has been our experience that
this can take 2 or 3 days.) All monies due at completion are to be paid directly to the
installation crew (½ at the commencement of work, the balance upon completion of work)
unless specified otherwise. Dealer cannot be held responsible for installation if not
installed by dealer." (Emphasis added.)
The contract also includes an arbitration provision. The contract states further that the purchaser can cancel the contract within three days of execution.
On March 16, 2002, Brown telephoned Pool Depot to cancel the contract. Thereafter, Pool Depot sent Brown a document entitled "Official Document, Lien Notice, Illegal Cancellation," which reads, in part:
"What is Illegal Cancellation? According to Section K, Number 15, `I(we) understand agree that no Verbal, Telephone, or Facsimile transmitted cancellation of this contract can be accepted and that no penalty or fee may be assessed by dealer if proper cancellation notification is given as defined by the 3-Day "Buyers Right to Cancel". I(we) agree that this agreement cannot be cancelled for any reason after the 3-Day "Buyer's Right to Cancel" has expired unless the entire purchase price is paid to dealer.' YOU DID NOT PROVIDE A LEGAL CANCELLATION NOTIFICATION AS DEFINED BY THE 3-DAY `BUYERS RIGHT TO CANCEL', THEREFORE YOU CANCELLED ILLEGALLY. You now owe us the Full Purchase Price.

"If you do not work out this problem by calling 1-800-788-1831, Ext 1. (ask for Mr. Clark), within 10 days we may, at our option, file the attached lien against your personal residence and/or any other personal property that you may own, including but not limited to your personal residence, checking or savings account, retirement account, car, furniture, etc., that will accrue interest at 1-and-½% per month, (18% per year), until the lien is paid in full....
"If you choose not to work this problem out with us after we file the lien and disagree with our legal position, we will be glad to go to Binding Arbitration as contained on the front of the Pool Contract you signed (See Pool Contract Section G Binding Arbitration Agreement). Neither you nor us can file a lawsuit as, according to the Arbitration agreement, the only option is to go to Binding Arbitration in Cobb County, Georgia. If we lose, (we have never lost an arbitration hearing), we will release the lien. If we win, the arbitrator will order you to pay us.

"Most consumers are surprised [ (this emphasis added) ] to find out in a legal proceeding, such as an arbitration hearing, the written Pool Contract always rules the outcome. What a salesperson or company representative allegedly says has no bearing on how an arbitrator rules....
"Sincerely,
"Mr. Clark
"P.S. Let's be reasonable. Why pay the FULL PURCHASE PRICE OR OUR ATTORNEY FEES (under Section N, `Attorney Fees: Purchaser agrees to pay Pool Depot's attorney fees necessary to defend any disputes and/or allegations arising in any manner relating to this agreement'), and your ATTORNEY FEES and still not have a pool to swim in?
"P.S. We also TAPE RECORDED the sale. Remember President Clinton paid Paula Jones approximately $900,000 and *184 got fined an additional $85,000 by the judge for testifying different from what was on the tape. The new Independent Counsel, after Kenneth Starr, also has the option to indict President Clinton for `PERJURY' after he leaves office. I think you will agree `PERJURY' is a serious offense."
Attached to the "Illegal Cancellation" document was another document purporting to be a lien by Pool Depot against Brown's home for $9,295, the purchase price for the pool minus the $200 deposit Brown had already paid.
After receiving the "Illegal Cancellation" document and the purported lien, Brown sued Pool Depot for fraudulent inducement and "tortious attempt to collect a debt by the threat of criminal prosecution." (Complaint, p. 3, C. 4.) The complaint alleges that "Defendant does not have a Certificate of Authority to do business in Alabama and is not license[d] to do business in this State ... [, and,] [t]herefore, the contract signed by the parties is void." (Id.) Brown attached to his complaint a copy of the pool contract.
Pool Depot moved to compel Brown to arbitrate his claims pursuant to the arbitration provision in the pool contract. Brown opposed the motion on the ground that the contract and its arbitration provision were void under Alabama's door-closing statute because Pool Depot had not qualified to do business in Alabama until some months after the execution of the Brown pool contract.
Pool Depot responded that, although it was not qualified to do business in Alabama when it entered the Brown pool contract, Pool Depot, as a business engaged in interstate commerce, was protected by the Commerce Clause of the United States Constitution from the operation of Alabama's door-closing statute to void the Brown pool contract. Pool Depot submitted as evidentiary support for this argument an affidavit from Pool Depot vice president Frank Loureire stating that the components of the aboveground pools are manufactured in other states, are shipped to Georgia for assembly, and are shipped to their final destination for installation. Loureire stated that Pool Depot "is a national company which does business nationwide." Loureire stated further that all monies paid to Pool Depot were deposited in an account in Atlanta, Georgia. While Loureire expressly denied that Pool Depot had ever had any offices in Alabama, he did not deny that it had agents in Alabama.
This appeal requires us to decide whether the business Pool Depot contracted to do in Alabama was localized in Alabama so as to constitute intrastate activity that incurred the governance of Alabama's door-closing statute, which would, in that case, void the Brown pool contract and bar Pool Depot from enforcing the contract and its arbitration provision. Alabama's door-closing statute, § 10-2B-15.02(a), Ala.Code 1975, provides:
"A foreign corporation transacting business in this state without a certificate of authority ... may not maintain a proceeding in this state without a certificate of authority. All contracts or agreements made or entered into in this state by foreign corporations prior to obtaining a certificate of authority to transact business in this state shall be held void at the action of the foreign corporation or by any person claiming through or under the foreign corporation by virtue of the contract or agreement; but nothing in this section shall abrogate the equitable rule that he who seeks equity must do equity."
Addressing whether a nonqualified foreign corporation may enforce its Alabama contracts, Alabama courts have said:

*185 "It has been held that a foreign corporation doing business in this state without qualifying cannot use our courts to enforce its contracts. Continental Telephone Corp. v. Weaver, 410 F.2d 1196 (5th Cir.1969). Alabama Const. art. XII, § 232, and §§ 10-2A-247 and 40-14-4, Code 1975 [now codified as 10-2B-15.02, Ala.Code 1975] prohibit a nonqualified foreign corporation from enforcing a contract made in Alabama if it is doing business in Alabama. Where the contract is to be performed in Alabama, regardless of where entered into, and in the performance of the contract the foreign corporation must engage in business in this state, our courts refuse to aid the nonqualified corporation in the enforcement of such contract. Sanjay, Inc. v. Duncan Construction Co., 445 So.2d 876 (Ala.1983). A nonqualified foreign corporation is not barred from enforcing its contracts, however, when it is engaged solely in interstate commerce. Kentucky Galvanizing Co. v. Continental Casualty Co., 335 So.2d 649 (Ala.1976)."
Competitive Edge, Inc. v. Tony Moore Buick-GMC, Inc., 490 So.2d 1242, 1244-45 (Ala.Civ.App.1986) (emphasis added). A "foreign corporation [may] not compel arbitration pursuant to an arbitration clause in a contract [if] the entire contract [is] unenforceable and invalid as a result of the foreign corporation's failure to qualify to do business in Alabama." Alabama Catalog Sales v. Harris, 794 So.2d 312, 315 (Ala.2000).
While Pool Depot argues that its performance of the Brown pool contract involved interstate commerce and that this involvement saved Pool Depot from the operation of Alabama's door-closing statute to void the contract and its arbitration provision, this Court recently said in Community Care of America of Alabama, Inc. v. Davis, 850 So.2d 283, 287 (Ala.2002):

"The test of the enforceability of the arbitration clause ... is not ... whether the transaction substantially affects interstate commercewhich is the proper analysis in cases not involving § 10-2B-15.02, see Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000)but [is] `whether the main or primary purpose of the [transaction] constitutes an interstate or intrastate activity.' Competitive Edge, Inc. v. Tony Moore Buick-GMC, Inc., 490 So.2d 1242, 1244-45 (Ala.Civ.App.1986). See also SAR Mfg. Co. v. Dumas Bros. Mfg. Co., 526 F.2d 1283, 1286 (5th Cir. 1976) (applying Alabama law); Camaro [Trading Co. v. Nissei Sangyo America, Ltd., 628 So.2d 463 (Ala.1993)]." (Some emphasis original; some emphasis added.)
A nonqualified foreign corporation's "`establish[ing] a continuing presence in the state over and above the mere shipping of commodities between the states' is intrastate activity." Community Care, 850 So.2d at 287 (quoting Wise v. Grumman Credit Corp., 603 So.2d 952, 953 (Ala. 1992)). The United States Supreme Court has held that "a state's forum closing statute does not unduly burden interstate commerce when the foreign corporation has `"localized its business"' in the state and when it is not entering the state `"to contribute to or to conclude a unitary interstate transaction."'" S & H Contractors, Inc. v. A.J. Taft Coal Co., 906 F.2d 1507, 1511 (11th Cir.1990) (quoting Allenberg Cotton Co. v. Pittman, 419 U.S. 20, 32-33, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974) (quoting in turn Union Brokerage Co. v. Jensen, 322 U.S. 202, 210, 64 S.Ct. 967, 88 L.Ed. 1227 (1944))) (emphasis added).
"Our courts have held that transactions in Alabama by a nonqualified foreign *186 corporation involving no more than a sale, transportation, and delivery of materials into this state are acts of interstate commerce to which the laws of Alabama are not applicable. Loudonville Milling Co. v. Davis, 251 Ala. 459, 37 So.2d 659 (1948). Mere business solicitations and incidents relative to such solicitations do not constitute transaction of business by a foreign corporation within the state of Alabama for purposes of the statutory and constitutional provisions at issue in this case. Swicegood v. Century Factors, Inc., 280 Ala. 37, 189 So.2d 776 (1966)."

Competitive Edge v. Tony Moore Buick-GMC, 490 So.2d 1242, 1244 (Ala.Civ.App. 1986) (emphasis added).
"`It is evident that, had the transaction in question involved no more than the sale and delivery of the machinery by the plaintiff to the defendant in Alabama, it would have been an act of interstate commerce, to which the laws of Alabama are not and could not be applicable. But the contract was not for the sale of machinery. It was an entire contract for transporting and assembling (that is, building into a structure) certain materials on the defendant's premises. This included, as set forth in the complaint, and replication both labor and materials; and the fruition of the contract was not the delivery of an article of commerce to the defendant, but the erection of an improvement on its premises for a gross consideration. Beard's Case, 71 Ala. 60.'"
Computaflor Co. v. N.L. Blaum Constr. Co., 289 Ala. 65, 68, 265 So.2d 850, 852 (1972) (quoting American Amusement Co. v. East Lake Chutes Co., 174 Ala. 526, 56 So. 961 (1911)) (emphasis added).
"One area of business is quite clearly defined as intrastate, rather than interstate, activity. This Court has previously held that `labor is not an article of commerce, nor is the agreement to supply it, nor the execution of the agreement, an act of commerce.' Computaflor v. N.L. Blaum Const. Co., 289 Ala. 65, 68, 265 So.2d 850, 852 (1972), citing American Amusement Co. v. East Lake Chutes Co., 174 Ala. 526, 530, 56 So. 961, 963 (1911). A construction contract supplying both material and labor is an example of the type of contract that is considered intrastate. See Sanjay, Inc. v. Duncan Const. Co., 445 So.2d 876, 879 (Ala.1983) (sale, delivery, and supply of labor and management to construct prefabricated building is intrastate activity); Computaflor, supra, (sale, delivery, and labor to construct a gymnasium floor are intrastate activities); Cadden-Allen, Inc. v. Trans-Lux News Sign Corp., 254 Ala. 400, 48 So.2d 428 (1950) (sale, installation, maintenance, repair for a period of one year, and removal of signs are intrastate activities); Calvert Iron Works, Inc. v. Algernon Blair, Inc., 284 Ala. 655, 227 So.2d 424 (1969) (sale, delivery, and erection of steel are intrastate activities)."
Green Tree Acceptance, Inc. v. Blalock, 525 So.2d 1366, 1370-71 (Ala. 1988) (emphasis added). An isolated contract by an unqualified foreign corporation to do localized intrastate business within Alabama is subject to Alabama's door-closing statute even though that contract may require the use of materials and equipment shipped into Alabama from out of state. See Green Tree Acceptance, supra; Sanjay, Inc. v. Duncan Constr. Co., 445 So.2d 876 (Ala.1983); Computerflor, supra; and Calvert Iron Works, Inc. v. Algernon Blair, Inc., 284 Ala. 655, 277 So.2d 424 (1969).
In the case now before us, the activity by Pool Depot under the Brown pool contract involved more than the mere solicitation of business here and more than *187 the mere delivery of items sold. Pool Depot sent a representative to Alabama to solicit customers like Brown. Pool Depot then contracted to sell, to deliver, to assemble, and to install a 24-foot-diameter round aboveground pool at Brown's Alabama residence for a total cost of $9,495. Pool Depot agreed to supply the materials and to furnish the labor for the assembly and installation of the pool in Alabama. The installation crew would work in Alabama "one or more days." Upon completion of installation of the pool, Pool Depot was to be paid in Alabama. Pool Depot's entire performance under the contract was to occur in Alabama. "`[T]he fruition of the contract was not the delivery of an article of commerce [i.e., pool components] to [Brown], but the erection of an improvement on [his] premises for a gross consideration.' " Computaflor, 289 Ala. at 68, 265 So.2d at 852 (citing Beard's Case, 71 Ala. 60). Thus, in contracting to sell, to deliver, to assemble, and to install an aboveground pool at Brown's residence in Alabama, Pool Depot engaged in intrastate activity in Alabama when it was not qualified to do so. Consequently, Alabama's door-closing statute operates against Pool Depot to void the pool contract and its arbitration provision.
Brown's suing Pool Depot for fraud and tortious attempt to collect a debt and opposing arbitration of these claims is not an unlawful attempt to "accept the benefits and avoid the burdens or limitations of a contract," Georgia Power Co. v. Partin, 727 So.2d 2, 5 (Ala.1998) (quotation marks and citations omitted). Brown does not seek any benefit whatsoever under the contract, which Brown contends is void.
The trial court erred in ordering Brown to arbitrate his claims against Pool Depot. Therefore, we reverse the judgment of the trial court and remand this cause for the trial court to vacate its order for arbitration and to conduct further proceedings in this case.
REVERSED AND REMANDED.
MOORE, C.J., and HOUSTON and WOODALL, JJ., concur.
LYONS, J., concurs specially.
LYONS, Justice, concurring specially.
I concur fully in the majority opinion. I write specially to address Pool Depot's reliance upon Wallace Construction Co. v. Industrial Boiler Co., 470 So.2d 1151 (Ala. 1985). In Stewart Machine & Engineering Co. v. Checkers Drive In Restaurants of North America, Inc., 575 So.2d 1072, 1074-75 (Ala. 1991), this Court described Wallace Construction as holding that
"in a contract for the sale of a complex boiler system that required the seller to supply labor for assembly, installation, adjustment, and activation of the boiler, as well as personnel training, these activities were both `necessary and incidental to the interstate sale of the boiler itself; thus, the contract was held not to involve intrastate activity."
Then the Court in Stewart Machine held that the erection of a prefabricated building constituted intrastate activity, noting as follows:
"The construction and labor required to complete performance of the contract was substantial enough that it was not merely incidental to the sale of the structure. Although much of the construction work could be accomplished only at the site, the work was of a very general nature that could have been handled by almost any competent contractor and did not require the special expertise of Stewart. It is this element that distinguishes the Stewart-Checkers *188 contract from the contract in Wallace Construction Co., supra."

575 So.2d at 1075.
Pool Depot argues that "[t]he only difference between the present case, and Wallace Construction, is that the item being sold in Wallace Construction was a boiler; while in this case, it is an aboveground pool." I disagree. This Court has recognized that the sale, delivery, and supply of labor and management to construct a prefabricated building is intrastate activity. See Sanjay, Inc. v. Duncan Constr. Co., 445 So.2d 876, 879 (Ala.1983). I find the rationale for distinguishing Wallace Construction employed in Stewart Machine persuasive. This case falls under the heading of erection of a prefabricated product, not the installation of a complex piece of machinery, for which the provision of labor to install it became a reasonable and appropriate incident of the sale.